IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LAND VENTURES FOR 2, LLC,   )
                            )
        Plaintiff,          )
                            )
v.                          )        CASE NO. 2:12-CV-240-WKW
                            )                [WO]
MICHAEL A. FRITZ, SR., *et al.*,   )
                            )
        Defendants.         )
                            )

## MEMORANDUM OPINION AND ORDER

## I. INTRODUCTION

Plaintiff Land Ventures for 2, LLC ("Land Ventures") was in the business of buying and selling real property. When the economic downturn affected the business's bottom line, Todd Pittman (Land Ventures' 99% owner) sought assistance from bankruptcy counsel and eventually retained the defendants, Michael Fritz and his law firm (collectively "Fritz"), in July 2009. In March 2010, Fritz filed a Chapter 11 bankruptcy proceeding on behalf of Land Ventures in order to forestall foreclosure proceedings that Farm Credit of NW Florida ("Farm Credit") had commenced against two of Land Ventures' most valuable properties.

Throughout the bankruptcy proceedings, Land Ventures failed to offer Farm Credit adequate protection on its secured claim. Farm Credit was an aggressive creditor, objecting to most of Land Ventures' filings in the bankruptcy case, and

early on sought relief from the automatic stay in order to proceed with the foreclosures on the two properties.  (BP Doc. # 50.)[1]  The bankruptcy court ultimately lifted the stay, after a hearing.  (BP Doc. # 106.)

During the pendency of the bankruptcy, Land Ventures never filed a Chapter 11 plan, and, the bankruptcy court, after denying Land Ventures' motion to extend time to file a plan, converted the case to a Chapter 7 proceeding.  (BP Docs. #167, 176, 180.)  A Chapter 7 trustee was appointed, and she liquidated Land Ventures' remaining assets.

On March 15, 2012, Land Ventures filed this malpractice action against Fritz in the district court.[2]  The matter was referred to the bankruptcy court, where the parties filed opposing motions for summary judgment (Doc. # 28; MP Docs. # 31, 33.)  Before the court is the bankruptcy judge's Recommendation that Fritz's motion for summary judgment be granted, that Land Ventures' motion for

---

[1] The briefs and exhibits are filed in the district court case (2:12-CV-240) as attachments to the bankruptcy clerk's certification of the record (Doc. # 34).  It is efficient to cite the record by reference to the docket in the miscellaneous proceeding opened in the bankruptcy court (Case No. 13-MP-302) upon referral of this matter, as the document numbers in the latter proceeding align with those in the briefs and objection.  Additionally, Defendants refer to the pleadings of record in the underlying bankruptcy case in support of their motion.  Documents filed in the underlying bankruptcy proceeding (Bankruptcy Case No. 10-30651) are cited as "BP Doc. # . . . ," and those filed in the bankruptcy miscellaneous proceeding are cited as "MP Doc. # . . . ."

[2] Until October 9, 2015, Chief Magistrate Judge Susan Russ Walker presided over this action pursuant to the parties' consent and a general order of the court regarding the primary assignment of a percentage of specified civil cases to the magistrate judges.  For reasons explained in a recent order (Doc. # 36), the district court, on its own motion, vacated the consent and primary assignment of this action to the magistrate judge.

summary judgment be denied, and that the civil action be dismissed with prejudice. (Doc. # 34-1.)  Land Ventures filed a timely objection (MP Doc. # 50) to the Recommendation to which Fritz filed a response.  (MP Doc. # 52.)

After careful consideration of the record, the applicable case law, and the Recommendation, the court finds that the Recommendation on the issue of causation is due to be adopted, Land Ventures' motion for summary judgment (MP Doc. # 31) is due to be denied, and Fritz's motion for summary judgment (MP Doc. # 33) is due to be granted.

## II. JURISDICTION AND VENUE

The bankruptcy judge determined that subject-matter jurisdiction was proper pursuant to 28 U.S.C. § 1332.   Although this court disagrees with that determination, it nonetheless finds that subject-matter jurisdiction is proper under 28 U.S.C. § 1334(b).  Section 1334(b) provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."  28 U.S.C. § 1334(b).  A case is "related to" a case under title 11 if "'the outcome of the proceeding could conceivably have an effect on the estate being administered in bankruptcy.'" *Cont'l Nat'l Bank of Miami v. Sanchez* (*In re Toledo*), 170 F.3d 1340, 1345 (11th Cir. 1999) (quoting *Miller v. Kemira, Inc. (In re Lemco Gypsum, Inc.)* 910 F.2d 784, 788 (11th Cir. 1990)).

As found in the prior Order that withdrew the referral to the magistrate judge, this action is "related to" Land Ventures' bankruptcy proceeding, which undisputedly is a "case[ ] under title 11," § 1334(b).  (*See* Doc. # 36, at 8–14.) Based on those findings, the court properly exercises subject-matter jurisdiction pursuant to § 1334(b).  Personal jurisdiction and venue are not contested.

### III.  STANDARDS OF REVIEW

The court reviews *de novo* "those matters [in the Recommendation] to which any party has timely and specifically objected."  28 U.S.C. § 157(c)(1).

The court applies the same standard as the bankruptcy judge.  To succeed on summary judgment, the movant must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "[T]he court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment."  *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact.  *Id*.  Or a movant who does not have a trial burden of production can assert, without citing the record, that the nonmoving party "cannot produce

4

admissible evidence to support" a material fact.  Fed. R. Civ. P. 56(c)(1)(B); *see also* Fed. R. Civ. P. 56 advisory committee's note ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials. . . . [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact.").  If the movant meets its burden, the burden shifts to the nonmoving party to establish—with evidence beyond the pleadings—that a genuine dispute material to each of its claims for relief exists.  *Celotex*, 477 U.S. at 324.  A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor. *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001). On the other hand, "[i]f the evidence is merely colorable or is not significantly probative, summary judgment may be granted."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).

## IV.  BACKGROUND

Throughout the present litigation, Land Ventures has asserted that Fritz's conduct led to the conversion of its Chapter 11 bankruptcy to a Chapter 7 bankruptcy and the subsequent liquidation of all of its assets.  Land Ventures maintains that there were three possible plans that Fritz could have proposed that would have been confirmed by the bankruptcy court and under which Land

Ventures could have successfully reorganized and maintained possession and control of the majority of its properties.

Land Ventures owned two properties (located in Luverne, Alabama, and Holmes County, Florida), which secured a loan from Farm Credit. It also owned Pittman's home and the surrounding property (Deerfield Plantation), which secured a loan from Regions Bank, as well as several unencumbered properties. The balance owed on the loan to Farm Credit was roughly $700,000, and the balance of the Regions Bank loan was approximately $650,000.

In 2008, Land Ventures stopped paying Farm Credit (with the exception of one payment of $25,000 in April 2009), and in 2009, it stopped paying Regions Bank. Pittman attempted, unsuccessfully, to negotiate a modification with Farm Credit, and Fritz continued these negotiations. However, in March 2010, Farm Credit began foreclosure proceedings on the Luverne and Holmes County properties. In order to stop the proceedings, Fritz filed a Chapter 11 bankruptcy on behalf of Land Ventures.

In the three years prior to the bankruptcy filing, Land Ventures had been unable to sell its properties, and the tax returns for those years show annual losses from $25,000 to nearly $45,000. Due to the lack of cash on hand, it appears that the only way for Land Ventures to avoid conversion to Chapter 7 and liquidation was to pledge or sell its unencumbered assets. However, it failed to do so. Pittman

6

testifies that he readily would have pledged or sold any of his other properties to keep the Luverne property and save his company, if Fritz had advised him that such action was necessary, but that Fritz advised against it.  To the contrary, Fritz testifies that he tried to get Pittman to pledge or sell the unencumbered assets, but Pittman adamantly refused to utilize any of Land Ventures' unencumbered property to satisfy its debt to Farm Credit.

Land Ventures filed this action against Fritz for malpractice pursuant to Alabama Code § 6-5-570, *et. seq.*, the Alabama Legal Services Liability Act ("ALSLA").  The parties filed cross motions for summary judgment.  In a written opinion, the bankruptcy judge recommended that Land Ventures' motion be denied and Fritz's motion be granted for the reasons that (1) Land Ventures offered no admissible evidence that Fritz's conduct violated the standard of care; (2) Land Ventures offered no admissible evidence concerning damages; and (3) Land Ventures failed to establish causation.  (Doc. # 34-1.)

Land Ventures filed objections to the Recommendation.  (MP Doc. # 50.)  It is not necessary to reach each of the forty-five objections because (1) Land Ventures' objections to the referral of this matter to the bankruptcy court are without merit, and (2) Land Ventures has not raised a genuine dispute of material

7

fact on the causation element of its ALSLA claim (*i.e.*, that but for Fritz's negligence, it would have had a better outcome in its bankruptcy proceeding).[3]

## V. DISCUSSION

### A.    Reference to the Bankruptcy Court

Land Ventures, in its first four objections, asserts that the referral of this action to the bankruptcy court was improper because the bankruptcy judge had made rulings in the bankruptcy case giving rise to the malpractice allegations. According to Land Ventures, the bankruptcy judge could not set aside his perceptions from those prior proceedings in order to apply proper legal standards on summary judgment in this malpractice action.  Land Ventures contends that the order of referral "implicitly or impliedly" required the bankruptcy court to reconsider many rulings and that this was "unfair" to the bankruptcy judge.  It also asserts that it did not move the district court to reconsider the order of referral because the "unfairness" of the referral was not evident until the entry of the Recommendation, which revealed the bias against Land Ventures.  (MP Doc. # 50, at 5–10.)

Land Ventures' contention that the referral was improper because the bankruptcy judge had formed a bias against Land Ventures during the underlying

---

[3] The issues concerning breach and damages need not be discussed, as the lack of evidence to support a causal connection between Fritz's conduct and any damages is sufficient to support the entry of summary judgment in Fritz's favor.

8

bankruptcy case is without merit. The "extrajudicial source" factor applies to 28 U.S.C. § 455(a) recusal analysis. *Liteky v. United States*, 510 U.S. 540, 554 (1994). "[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion . . . . Almost invariably, they are proper grounds for appeal, not for recusal." *Id.*at 555. Moreover, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.*

Land Ventures' objections are based solely upon the bankruptcy judge's knowledge of certain aspects of the malpractice suit gained from his position as the judge presiding over the bankruptcy proceeding in which the malpractice suit arose. Land Ventures presents no evidence suggesting that the bankruptcy judge harbored hostility or partiality toward any party or counsel so as to raise a specter of deep-seated bias. Therefore, the objections based upon the alleged bias of the bankruptcy judge are due to be overruled.

**B.    Causation**

### 1.    *General Principles of Law on Causation Under ALSLA*

To prevail on its ALSLA claim, Land Ventures must prove that Fritz failed "to comply with the applicable standard of care[,] the breach of which proximately

cause[d] the injury or damages." Ala. Code § 6-5-572(4); *see also id.* § 6-5-580;

*Indep. Stave Co. v. Bell, Richardson & Sparkman, P.A.*, 678 So. 2d 770, 772 (Ala.

1996) (elements of ALSLA claim essentially are the same as those of an ordinary

negligence claim: duty, breach, injury, proximate cause, and damages). Under

Alabama law, the proximate cause element of the ALSLA claim requires Land

Ventures to prove that, but for Fritz's breaches of the standard of care, the

underlying bankruptcy proceeding *would have* resolved more favorably to Land

Ventures, not merely that the result of the proceeding *might have* been more

favorable. *See Cribbs v. Shotts*, 599 So. 2d 17, 19 (Ala. 1992) (affirming directed

verdict; stating, "[T]he Cribbses failed to show that, but for [their attorney's]

alleged negligence, the disposition of the sale for division proceeding would have

been different," and, "[a]lthough the result of the proceeding *may* have been

different had [their attorney] been present at the hearing, the Cribbses were

required [but failed] to meet the higher burden of proving that the result *would*

have been different."); *see also Bonner v. Lyons, Pipes & Cook, P.C.*, 26 So. 3d

1115, 1125 (Ala. 2009) (affirming directed verdict for attorney and firm in legal

malpractice action alleging that attorney's untimely renewal notice to franchisor

caused client to lose franchise and concluding that, even if notice had been timely,

franchisee did not have a legal right to renewal because it had failed to pay 50% of

the initial franchise fee at the time of renewal as required by the franchise

agreement); *Pickard v. Turner*, 592 So. 2d 1016, 1019 (Ala. 1992) ("In addition to the traditional elements of a negligence action, the legal malpractice plaintiff must prove that the transaction would have had a different result if the alleged negligence had not occurred."); *id.* ("'Generally, actionable [legal] malpractice cannot be established in the absence of a showing that the attorney's wrongful conduct has deprived the client of something to which he would otherwise have been entitled.'") (quoting 7A C.J.S. Attorney and Client § 255 at 462 (1980)).

### 2.   *General Principles of Law on Chapter 11 Plan Feasibility*

A bankruptcy court may not confirm a Chapter 11 plan unless it determines that the plan is feasible, *i.e.*, that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."   11 U.S.C. § 1129(a)(11).   To be "feasible," a plan "must offer a reasonable prospect of success and be workable." *United States v. Haas* (*In re Haas*), 162 F.3d 1087, 1090 (11th Cir. 1998); *F.H. Partners, LP v. Inv. Co. of the Sw, Inc.* (*In re Inv. Co. of the Sw., Inc.*), 341 B.R. 298, 310 (B.A.P. 10th Cir. 2006) ("Feasibility is the shorthand term for the requirement of confirmation as set forth in § 1129(a)(11); it imposes a requirement that any plan must provide a realistic and workable framework for reorganization.").   The debtor bears the burden of showing, by a preponderance of

the evidence, that a proposed plan is feasible.  *Id.*; *Save Our Springs (S.O.S.) Alliance, Inc. v. WSI (II)-COS, LLC (In re Save Our Springs (S.O.S.) Alliance, Inc.)*, 632 F.3d 168, 172 (5th Cir. 2011).  In determining feasibility, the bankruptcy court may consider

> (1) the adequacy of the debtor's capital structure; (2) the earning power of the debtor's business; (3) economic conditions; (4) the ability of the debtor's management; (5) the probability of the continuation of the same management; and (6) . . . any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

*S.O.S. Alliance*, 632 F.3d at 173 n.6 (citation omitted).  "Feasibility determinations must be 'firmly rooted in predictions based on objective fact.'"  *Danny Thomas Properties II, Ltd. P'ship v. Beal Bank, S.S.B. (In re Danny Thomas Props. II Ltd. P'ship)*, 241 F.3d 959, 964 (8th Cir. 2001) (quoting *Clarkson v. Cooke Sales and Service Co. (In re Clarkson)*, 767 F.2d 417, 420 (8th Cir. 1985)).

### 3.    *Analysis*

Based on the foregoing principles of law, Land Ventures must raise a genuine dispute of material fact that it could have presented a feasible reorganization plan that would have been confirmed by the bankruptcy court and successfully completed by Land Ventures.  Land Ventures submitted three hypothetical plans – two during discovery (Plan # 1 and Plan # 2) and one attached to its brief in opposition to Fritz's motion of summary judgment (Plan # 3) – that it

12

contends "clearly meet[] the feasibility test." (MP Doc. # 40, at 22; Land Ventures' Ex. D to MP Doc. # 40.) The analysis begins with Plan # 3.[4]

### a.  Plan # 3

Land Ventures asserts that, if Fritz had proposed Plan # 3 at the outset of the Chapter 11 case, Land Ventures could have paid Farm Credit's allowed claim entirely and the arrearage on the Regions Bank loan within ninety days of filing the petition for bankruptcy. Land Ventures' Debtor-In-Possession ("DIP") account would have had $115,013.02 remaining from these transactions. From this amount, Land Ventures would have paid $10,800 to the IRS for non-filing penalties, and, therefore, it "would still have had $104,213.02 in its DIP account after the payment of the allowed claims as well as its monthly cash flows (whatever those amounts were)." (MP Doc. # 40, at 22–23 and Ex. D.)

According to Land Ventures, if this hypothetical plan had been offered to and confirmed by the bankruptcy court, Land Ventures would have continued to hold title to several pieces of real estate, including a one-half interest in the two properties previously mortgaged to Farm Credit. Land Ventures also would have

---

[4] In its brief in opposition to Fritz's motion for summary judgment, Land Ventures does not address the feasibility of Plan # 1 or Plan # 2. Its only reference to any plan other than Plan # 3 was a reference to Fritz's deposition testimony that a plan proposing liquidation of some of Land Ventures' assets "could" have been approved. (MP Doc. # 40, at 20–21.) While unclear in the brief, the deposition reveals that the discussion was in relation to Plan # 2. (MP Doc. # 40-5, at 271–74.) Since Land Ventures devotes its brief to the feasibility of Plan # 3, this plan will be discussed prior to the discussion of the two hypothetical plans that were presented during discovery.

continued to own the Deerfield Plantation property, subject to the Regions Bank remaining mortgage lien in an approximate amount of $660,000.

To demonstrate causation on the basis of Plan # 3, Land Ventures ultimately must prove that: (1) the proposed plan rests on objective facts supported by the evidence; and (2) those objective facts are such that the bankruptcy court *would* have – not *may* have – approved the reorganization plan as one with a reasonable prospect of success. *See Cribbs*, 599 So. 2d at 19; *Haas*, 162 F.3d at 1090; *Danny Thomas Props.*, 241 F.3d at 964.

The success of Plan # 3 rests upon two transactions that would have given Land Ventures an infusion of cash and therefore the ability to pay off its obligations to Farm Credit and the IRS and still retain money to pay allowed claims in the Chapter 11 case. The evidence does not give rise to a reasonable inference that either of these transactions was likely to occur.

The first transaction relied upon by Plan # 3 is an oral agreement between Gregory Scott (on behalf of his construction company, 2H&V) and Pittman for 2H&V to purchase a half-interest in the Luverne, Alabama, and Holmes County, Florida, properties, contingent upon the properties being unencumbered. (MP Doc. # 40-9, at 9–18, 42, 53–55.) This agreement never was committed to writing, and when questioned, Scott testified that 2H&V's ability to make the investment was not with cash, but rather, a line of credit. (MP Doc. # 40-9, at 65–67.) During his

14

deposition in October 2013, Scott was not able to confirm whether 2H&V would have had to open a new line of credit, whether the line of credit would have been secured or unsecured, what Regions Bank (the creditor) would have required before allowing the draw, what the credit terms would have been, or whether 2H&V would have had the ability to service the debt associated with the draw. (MP Doc. # 40-9, at 67–71.)  Additionally, Scott testified that he and his partner "most likely" would have obtained appraisals of the properties prior to closing on a deal, and he was unable to give "a good answer" as to whether he would have gone forward with the transaction if the appraisals had been much lower than the two he had seen previously.  (MP Doc. # 40-9, at 75–76.)

Recognizing the deficiencies in Scott's deposition testimony, Land Ventures supplemented it by filing a declaration that Scott executed on March 1, 2014.  (MP Doc. # 40-2.)  Fritz filed a motion to strike the declaration, arguing that part of the declaration conflicted with Scott's deposition testimony.  (MP Doc. # 43.)  Land Ventures opposed the motion.  (MP Doc. # 44.)  The motion to strike remains pending and requires an examination of whether the sham-affidavit rule precludes consideration of the declaration.

Under the sham-affidavit rule, on summary judgment, the district court can disregard a party's affidavit as a sham when the affidavit "contradicts, without explanation, previously given clear testimony."  *Van T. Junkins & Assocs., Inc. v.*

15

*U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984); *see also Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 n.6 (11th Cir. 2012) (accord).

During his October 2013 deposition, while Scott testified that he and his partner "easily" had "the financial wherewithal" to pay $650,000 to purchase the land (MP Doc. # 40-9, at 18), upon further questioning, he clarified that this was not as certain as he originally had conveyed.  Instead, according to Scott, the $650,000 was not available in cash, but as a line of credit, and he was unsure as to certain details, such as whether the line of credit was already existing or whether 2H&V would be required to obtain a new line of credit, what the limit and terms of the line of credit would be, what conditions Regions Bank would put on the line of credit, and whether 2H&V would have the ability to service the line of credit.  (MP Doc. # 40-9, at 67–71.)  Scott additionally testified that he and his partner "[m]ost likely" would have obtained appraisals of the property prior to closing on the transaction, and he was unable to give "a good answer" about whether 2H&V would have gone forward with the deal if the appraisals revealed a much lower value for the properties than the preexisting appraisals.  (MP Doc. # 40-9, at 75–76.)

In his subsequent March 2014 declaration, Scott declares:

3.  I am familiar with the corporate records and acts of 2H&V Construction Services, LLC including the business records of the company.

16

4.  At any time from the summer of 2009 through the end of 2010 2H&V Construction Services, LLC had liquid assets in the form of cash or credit lines with which to purchase the desired one half interest in the Luverne and Holmes County Florida properties for $650,000.

5.  2H&V Construction Services, LLC could have closed on the transaction with Land Ventures for 2, LLC with very little notice.

6.  The only prerequisite to consummating the purchase that 2H&V Construction Services, LLC had was that upon delivering the payment of $650,000 both parcels would be unencumbered.

(MP Doc. # 40-2.)

Paragraph six of Scott's declaration contradicts his previous testimony that there would "[m]ost likely" be appraisals prior to consummating the deal and that he did not know if there would be a deal if the appraisal showed significantly decreased values in the properties.  (MP Doc. # 40-9, at 75–76.)  Additionally, paragraph five of the declaration contradicts Scott's testimony that he was unsure as to the availability of cash funds and the terms of the line of credit.  Absent an explanation of why Scott's testimony changed from financial uncertainty to certainty, paragraphs five and six contradict the earlier deposition testimony. Therefore, Fritz's motion to strike (MP Doc. # 43) is due to be granted as to paragraphs five and six of Scott's declaration.

Accepting as true that 2H&V wanted to purchase a half-interest in the two properties, had the financial means to pay $650,000 in 2009 and 2010, and, even that it could have closed on the transaction with "very little notice," Land

17

Ventures' evidence still is insufficient to establish that Fritz could have proposed a Chapter 11 reorganization plan that included a binding contract with 2H&V at or near the outset of the bankruptcy proceeding.  Viewed in the light most favorable to Land Ventures, the evidence is not sufficient to permit a reasonable inference that, had Fritz or Pittman asked him to do so in the spring/summer of 2010, Scott would have signed a written contract *binding* 2H&V to pay $650,000 for a one-half interest in the Luverne and Holmes County properties with the *only* condition being that they were unencumbered.  On the summary judgment record, it is not reasonable to infer that Scott would have signed such a contract without first obtaining independent appraisals, in view of Scott's deposition testimony that he most likely would have done so before going through with the transaction, and that he could not give a "good answer" about whether 2H&V would have closed on the deal if the independent appraisals came in low.  (MP Doc. # 40-9, at 75–76.)

The appraisal for the Luverne property that Pittman had shown to Scott was sufficient to support a total value of $1,026,000 for the two properties subject to Farm Credit's mortgage lien.[5]  The amount of that appraisal does not permit a reasonable inference that an *independent* appraisal obtained by 2H&V would have

---

[5] *See* Case No. 2:10cv839-MHT (appeal from bankruptcy court's ruling on Farm Credit's motion to lift the bankruptcy stay); Doc. # 3-18, $770,000 value for Luverne property as of 2/25/2010, according to Mitchell appraisal); Doc. # 3-18, Doc. # 3-15 ($256,000 for Holmes County, FL property as of 6/21/2010); Scott Dep., at 59–62.  (The appraisals were not themselves introduced on the present summary judgment motion but they are referenced in testimony and other documents submitted on the present motion).

18

been as high.   In fact, Farm Credit obtained a much lower appraisal in June 2010[6]

($771,000 total value for the two properties), which the bankruptcy court found

more accurately reflected the value of the properties.[7]   In short, whether an

independent appraisal obtained by 2H&V would have reported a value sufficient,

along with the unconfirmed rumor that Scott and his partner had heard from

Pittman that Walmart might be interested in the property, to cause Scott to go

through with the transaction is speculative.  (*See* MP Doc. # 4-9, at 75–76.)[8]  *See*

*Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation

does not create a *genuine* issue of fact; instead, it creates a false issue, the

demolition of which is a primary goal of summary judgment." (internal quotation

marks and citation omitted)).

The second transaction that Plan # 3 relies upon is the sale of a property

owned by Land Ventures in Rutledge, Alabama.  Even if Fritz could have reached

a binding deal with 2H&V, the $650,000 would not have been sufficient to pay off

---

[6] *See* Case No. 2:10-CV-839-MHT, Doc. # 3-16.

[7] *See* MP Doc. # 35-12, at 40–49; *see also* Case No. 2:10-CV-839-MHT, Doc. # 2-4, at 53; Docs. # 2-4, 3-17.

[8] After foreclosing on the property, Farm Credit sold the Holmes County property for $200,000.  Farm Credit sold the Luverne property for $300,000, after marketing it for almost two years.  (MP Doc. # 40-8, at 111–14.)

the loan to Farm Credit and the arrearage on the secured loan with Regions Bank.[9] Therefore, the sale of the Rutledge property also would have been necessary for Plan # 3 to be successful.  The evidence is not sufficient, however, to permit a reasonable inference that Fritz could have advanced the second contract cited in the hypothetical plan, for the sale of the entire Rutledge property to Stephens Construction for $202,400, in the early stages of the bankruptcy proceeding.

Land Ventures has filed the declaration of Michelle Stephens, CEO of Stephens Construction.  Stephens states that she purchased two acres of the Rutledge property from Land Ventures for $20,000 in a transaction approved by the bankruptcy court and, after conversion to Chapter 7, purchased the remainder of the Rutledge property (approximately nine acres) from the bankruptcy trustee for $182,400.  She states that she would have purchased the entire eleven-acre property "at any time in 2010 for the sum of $202,400" and that Stephens Construction had cash on hand to pay for the tract of land.  (MP Doc. # 40-3.)

Thus, it is undisputed that Stephens paid $202,400 for the entire Rutledge tract and would have done so "at any time in 2010."  However, Land Ventures has not pointed to any evidence that it would have *accepted* an offer from Stephens to

---

[9] As of June 17, 2010, the arrearage on the Regions Bank loan was $24,502.56, not including late charges and fees; on the filing date of the bankruptcy petition, the arrearage was $16,357.08.  (BP Doc. # 66, at 3; BP Claim # 4-1.)  As of July 13, 2010, Land Ventures owed Farm Credit $707,449.53 in principal and interest, not including default interest, late charges, or collection costs.  (7/13/2010 H'rg Tr., at 40.)

20

purchase the entire tract in 2010 for $202,400.  The evidence does not permit a reasonable inference that Land Ventures would have done so.  Here is why.

On April 23, 2010, Pittman (in his capacity as Land Ventures' manager and 99% owner) testified at a meeting of creditors that the Rutledge property was then listed for sale for $750,000 and had been listed at that price for several months previously.  (MP Doc. # 35-11, at 33–34.)  At the August 26, 2010 continuation hearing in the bankruptcy court on Farm Credit's motion to lift the bankruptcy stay, Pittman testified that, since July, he had been negotiating with Stephens regarding a sale of the Rutledge property.  He testified that Stephens had offered $385,000 for the entire property ($35,000 per acre for eleven acres), that Pittman had countered the offer with a price of $400,000 and, thereafter, that he and Stephens ended up negotiating for the sale of just two acres on the back of the property.  Ultimately, they agreed to a sale of the two acres, "probably the worst two acres on the tract" according to Pittman's deposition testimony, at the price of $10,000 per acre.  (MP Doc. # 35-12, at 31–35; MP Doc. # 40-7, at 455.)  On September 6, 2011, almost eighteen months after the bankruptcy petition was filed, Pittman, in his capacity as a creditor of Land Ventures, filed a *pro se* motion in which he contended that the trustee's proposed sale of the remaining acreage to Stephens was objectionable because "the proposed sale price [of $182,400] is for sums less than the fair market value of the property."  (BP Doc. # 241.)

Since Land Ventures did not accept Stephens Construction's offer of $385,000 for the Rutledge property in July/August 2010, while Land Ventures was in the midst of litigating a potential lift of the bankruptcy stay as to Farm Credit, Land Ventures fails to show how it is reasonable to infer that Land Ventures would have accepted an offer of $202,400 at that time or earlier. Thus, Land Ventures has failed to introduce evidence sufficient to raise a genuine dispute of material fact that Fritz could have proposed a plan early in the bankruptcy proceeding that included a contract to sell the Rutledge property for $202,400.

In addition to the feasibility issues presented based on these two speculative real estate transactions, Plan # 3 also fails for its lack of providing service of its debt to Regions Bank. When the bankruptcy case was filed, Land Ventures was in default on its Regions Bank loan for the payments due November 1, 2009, and thereafter. (BP Doc. # 66, at 3.) Land Ventures argues that Farm Credit would have responded favorably to its plan. However, it advances no argument and cites no evidence indicating how Regions Bank, also a secured creditor, would have viewed Plan # 3. In particular, Plan # 3 does *not* propose payment in full of Regions Bank's "claim within the first ninety days of the Chapter 11 case," but proposes only to pay the arrearage upon closing on the Stephens Construction and 2H&V contracts, and does not explain how Land Ventures intended to service its debt to Regions Bank going forward. (*See* MP Doc. # 40, at 23.)

In the recommendation, the bankruptcy judge observes that Land Ventures "had a negative cash flow," as evidenced by its monthly operating reports (MP Doc. # 33-14) and Roger Spain's analysis (MP Doc. # 20). The bankruptcy judge concludes that whether Land Ventures can satisfy the causation element of its malpractice claim "turns on the validity of the two sales." (Doc. # 34-1, at 30.) As previously discussed, both of the sales are speculative, and the evidence does not permit a reasonable inference that Fritz would have been able to obtain binding contracts with 2H&V or Stephens on the terms described in Plan # 3.

### b.   Plan # 1

Land Ventures presented two additional hypothetical plans during discovery. Plan # 1, in contrast to Plan # 3, does not include the contract with Stephens, but provides for liquidation of unspecified properties if the plan's cash flow was not sufficient to make Land Ventures' monthly payments to Regions Bank. Plan # 1 also provides for the payment of $500,000 to Farm Credit from the proceeds of the sale of a one-half interest in the Luverne and Holmes County properties, and for a blanket lien on all of Land Ventures' remaining unsecured properties to secure payment of the approximately $250,000 loan balance. The plan states that Land Ventures "intends to sell one or more currently unencumbered properties to pay the remaining balance of the claim to [Farm Credit] and will pay adequate protection payments to [Farm Credit] until the balance is paid in full" or, in the alternative,

23

that Land Ventures will seek financing from another lender.  (MP Doc. # 33-1, at 44, 46.)

However, the plan does not specify a time within which or means by which Land Ventures intended to sell the properties.  Land Ventures made no argument regarding the feasibility of this plan, and as discussed, the evidence does not give rise to a reasonable inference that Fritz could have presented a binding offer from 2H&V in support of a reorganization plan.  Even assuming that Land Ventures' evidence regarding the 2H&V contract were sufficient, it has not pointed to evidence sufficient to demonstrate that its proposal to liquidate unspecified unencumbered assets to satisfy its debt to Regions Bank and its remaining obligation to Farm Credit would have resulted in confirmation of Plan # 1.  *See Danny Thomas Props.*, 241 F.3d at 963 (a plan provision requiring a sale of assets to satisfy claims does not render a plan feasible as a matter of law); *In re Hoffman*, 52 B.R. 212, 215 (Bankr. D.N.D. 1985) ("[T]he [c]ourt is not satisfied that the proposed sale of the real estate as contemplated [by the Plan] is sufficiently concrete to assure either consummation within the two years or that even if sold within the two-year period the price obtained would be sufficient to pay the principal balance and accrued interest owing to Federal Land Bank.").

24

### c.    Plan # 2

In Plan # 2, Land Ventures proposes to "liquidate certain of its properties in order to satisfy the indebtedness owed to [Farm Credit]."  (MP Doc. # 33-1, at 53.) Plan # 2 additionally offers an adequate protection payment of $500 monthly to Farm Credit, along with a blanket lien upon the unencumbered properties.  Farm Credit would receive 80% of the net received upon the sale of a property toward satisfaction of its claim, and the remaining 20% would be used for payment of other claims in the case, as well as expenses and fees.  (MP Doc. # 33-1, at 53.) The plan provides payment of the Regions Bank debt from "ongoing operations of the business" or, if the cash flow is not sufficient to make monthly payments to Regions, liquidation of the debtor's assets.  (MP Doc. # 33-1, at 51.)

Plan # 2, in a similar fashion to Plan # 1, relies on the liquidation of unspecified unencumbered assets.  Land Ventures' business consisted of selling its real estate assets.  The record demonstrates that it had not been able to operate this real estate sales business in a profitable manner in the three years preceding the petition.  Although Plan # 2 commits to Farm Credit $500 per month in "adequate protection payments" while Land Ventures liquidates "certain of its properties," and pledges to Farm Credit 80% of the net proceeds from any real estate sales that it consummates during the *unspecified* period of reorganization, it is essentially the same plan that Land Ventures followed before bankruptcy.  That is, Land Ventures

25

will pay its creditors out of income derived from selling its real estate, whenever it is able to sell its real estate.

Land Ventures' history of operations provides no support for the plan's provision that Regions Bank would "continue to be paid from the ongoing operations of the business." (MP Doc. # 33-1, at 51.)  Land Ventures had not been able to make its monthly payments to Regions for five months pre-petition (*see* BP Doc. # 66, at 3), and there is no evidence suggesting that the real estate market was improving in the months following Land Ventures' petition for relief. Additionally, Plan # 2 makes no provision for curing the arrearage to Regions Bank, and its fall-back plan for paying Regions Bank is to "liquidate assets." (MP Doc. # 33-1, at 51.)  However, the plan allocates 100% of the net proceeds from the sale of any property for purposes other than paying Regions, at least until Farm Credit is paid in full. (MP Doc. # 33-1, at 53.)

Land Ventures bears the burden at trial of proving, that but for Fritz's breach of the standard of care, the bankruptcy proceeding *would* have resolved more favorably to Land Ventures, not merely that it *could* have done so.  Land Ventures has offered three hypothetical reorganization plans in an attempt to demonstrate that it satisfies the causation element of its ALSLA claim.  However, the evidence does not permit a reasonable inference that the bankruptcy court would have found any of the three hypothetical plans to be feasible, as required for confirmation by

26

11 U.S.C. § 1129(a)(11), or that Land Ventures would have completed any of the plans successfully.  Accordingly, at summary judgment, Land Ventures has failed to establish a genuine dispute of material fact on the issue of whether the underlying bankruptcy proceeding would have resolved more favorably to Land Ventures, but for Fritz's alleged breaches of the standard of care.  Summary judgment is due to be entered against Land Ventures and in favor of Fritz.

## VI.  CONCLUSION

For the foregoing reasons, it is ORDERED as follows:

(1)    Fritz's Motion to Strike (MP Doc. # 44) is GRANTED as to paragraphs 5 & 6 of Scott's Declaration (MP Doc. # 40-2, Ex. B);

(2)    Land Ventures' Objection (MP Doc. # 50) is OVERRULED;

(3)    The Recommendation on the issue of causation (Doc. # 34) is ADOPTED;

(4)    Fritz's Motion for Summary Judgment (MP Doc. # 33) is GRANTED; and

(5)    Land Ventures' Motion for Summary Judgment (MP Doc. # 31) is DENIED.

A final judgment will be entered separately.

DONE this 29th day of October, 2015.

_____
/s/ W. Keith Watkins
CHIEF UNITED STATES DISTRICT JUDGE